Approved: _____
DAVID M. ABRAMOWICZ / DINA MCLEOD
Assistant United States Attorneys

Before:  THE HONORABLE MICHAEL H. DOLINGER
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - - x
                                  :  SEALED COMPLAINT
UNITED STATES OF AMERICA          :
                                  :  Violation of
        - v. -                    :  18 U.S.C. § 1349
                                  :
CHANDRICA CLARKE,                 :  COUNTY OF OFFENSE:
                                  :  NEW YORK
                Defendant.        :
                                  :
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

ELIZABETH NYGAARD, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

COUNT ONE
(Conspiracy to Commit Bank Fraud)

1. From at least in or about March 2015 up to and including at least in or about May 2015, in the Southern District of New York and elsewhere, CHANDRICA CLARKE, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

2. It was a part and an object of the conspiracy that CHANDRICA CLARKE, the defendant, and others known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud financial institutions, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institutions, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United

States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

3. I have been a Special Agent with the FBI for approximately 18 years. I have participated in numerous investigations of federal criminal laws, including violations of Title 18, United States Code, Sections 1344 and 1349.

4. I have been personally involved in the investigation of this matter. This Affidavit is based upon my personal participation in the investigation, my interviews with witnesses, my review of law enforcement, bank, real estate, email, and other records, and my conversations with other law enforcement agents. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Background

5. Since at least in or about January 2015, a purported law firm called "Shariff & Associates PC" or "Shariff & Associates P Corp" (the "Purported Law Firm"), a purported attorney named "Abdul Shariff, Esq." (the "Purported Attorney"), and others have falsely claimed to represent real estate owners as part of a scheme to persuade victim-buyers to pay substantial sums of money to "purchase" those owners' properties. The victims' payments are deposited into bank accounts controlled by co-conspirators, including accounts held in the name of the Purported Law Firm, then promptly withdrawn. To carry out the scheme, co-conspirators have, among other things, made false statements to banks in order to open accounts, removed and changed locks at properties owned by others, "sold" the same property multiple times to different purchasers, and posed as actual property owners, including by displaying fraudulent identification cards in the names of the actual owners, at real-estate closings.

6. To date, my investigation has identified approximately $6.1 million in intended losses associated with

the fraud.

7.  Based on my review of documents, including rental agreements and email correspondence, maintained by companies that rent "virtual office" spaces, I have learned, among other things, the following:

   a.  From on or about January 19, 2015 up to and including on or about June 12, 2015, the Purported Law Firm rented at least two "virtual office" spaces in New York, New York. The "virtual offices" consisted of business addresses where the Purported Law Firm could, among other things, send or receive mail, and use the services of a receptionist to answer and forward communications from individuals attempting to contact the Purported Law Firm.

   b.  Documents and communications sent to and from the Purported Law Firm via the virtual offices include documents and communications sent to and from the Purported Attorney.

### Fraudulent Real-Estate Sales

8.  From my conversations with representatives of an entity (individually and collectively, "Purchaser-1") that intended to purchase a residential property in Brooklyn, New York ("Property-1"), and from my review of documents, including email communications and bank records, I have learned, among other things, the following:

   a.  On or about January 20, 2015, Purchaser-1 began communicating with the Purported Attorney, who claimed to work at the Purported Law Firm, and with a purported realtor ("Purported Realtor-1") about the potential purchase of Property-1. The Purported Attorney claimed to represent the owner of Property-1 ("Property Owner-1").

   b.  In or about early March 2015, Purchaser-1 reached an agreement ("Contract-1") to purchase Property-1 for a total of $600,000, with $20,000 due as a down payment. An authorized representative of Purchaser-1 signed Contract-1, which also appeared to have been signed by the Purported Attorney and Property Owner-1.

   c.  In or about early March 2015, Purchaser-1 sent the Purported Attorney a down payment in the form of a check for $20,000 payable to the Purported Attorney ("Down Payment-1").

9. Based on my conversations with and my review of documents provided by Property Owner-1 and authorized representatives of Property Owner-1, I have learned, among other things, the following:

   a. Property Owner-1 never authorized the Purported Law Firm, the Purported Attorney, or Purported Realtor-1 to conduct any transaction or other business on Property Owner-1's behalf. Nor did Property Owner-1 convey any right or interest related to Property-1 to the Purported Law Firm or the Purported Attorney.

   b. Property Owner-1 neither signed nor authorized anyone else to sign Contract-1.

10. From my conversations with representatives of an entity (individually and collectively, "Purchaser-2") that intended to purchase a residential property in Brooklyn, New York ("Property-2"), and from my review of documents, including email communications and bank records, I have learned, among other things, the following:

   a. In or about March 2015, Purchaser-2 began communicating with the Purported Attorney about the potential purchase of Property-2. The Purported Attorney claimed to work at the Purported Law Firm and to represent the owner of Property-2 ("Property Owner-2").

   b. In or about March 2015, Purchaser-2 reached an agreement ("Contract-2") to purchase Property-2 for a total of $625,000, with $62,500 due as a down payment. Purchaser-2 signed Contract-2, which also appeared to have been signed by the Purported Attorney and Property Owner-2.

   c. On or about March 12, 2015, pursuant to instructions sent by the Purported Attorney, Purchaser-2 wired a down payment of $62,500 ("Down Payment-2") to a Bank of America account in the name of the Purported Law Firm ("Purported Law Firm Account-1").

11. Based on my conversations with and my review of documents provided by Property Owner-2 and authorized representatives of Property Owner-2, I have learned, among other things, the following:

   a. Property Owner-2 never authorized the Purported Law Firm or the Purported Attorney to conduct any transaction or other business on Property Owner-2's behalf. Nor

4

did Property Owner-2 convey any right or interest related to Property-2 to the Purported Law Firm or the Purported Attorney.

        b.    Property Owner-2 neither signed nor authorized anyone else to sign Contract-2.

        12.    From my conversations with representatives of an entity (individually and collectively, "Purchaser-3") that intended to purchase a residential property in Queens, New York ("Property-3"), and from my review of documents, including email communications and bank records, I have learned, among other things, the following:

        a.    In or about February 2015, Purchaser-3 communicated with the Purported Attorney, who claimed to work at the Purported Law Firm, and a purported realtor ("Purported Realtor-2") about the potential purchase of Property-3. The Purported Attorney claimed to represent the owner of Property-3 ("Property Owner-3").

        b.    In or about February 2015, Purchaser-3 reached an agreement ("Contract-3") to purchase Property-3 for a total of $400,000, with $40,000 due as a down payment. Purchaser-3 signed Contract-3, which also appeared to have been signed by the Purported Attorney and Property Owner-3.

        c.    In or about February 2015, Purchaser-3 sent the Purported Attorney a down payment in the form of a check for $40,000 payable to the Purported Attorney ("Down Payment-3").

        13.    Based on my conversations with and my review of documents provided by Property Owner-3 and authorized representatives of Property Owner-3, I have learned, among other things, the following:

        a.    Property Owner-3 never authorized the Purported Law Firm, the Purported Attorney, or Realtor-2 to conduct any transaction or other business on Property Owner-3's behalf. Nor did Property Owner-3 convey any right or interest related to Property-3 to the Purported Law Firm or the Purported Attorney.

        b.    Property Owner-3 neither signed nor authorized anyone else to sign Contract-3.

        14.    From my conversations with representatives of an entity (individually and collectively, "Purchaser-4") that intended to purchase a residential property in Queens, New York

("Property-4"), and from my review of documents, including email communications and bank records, I have learned, among other things, the following:

      a.    In or about February 2015, Purchaser-4 communicated with the Purported Attorney about the potential purchase of Property-4. The Purported Attorney claimed to work at the Purported Law Firm and to represent the owner of Property-4 ("Property Owner-4").

      b.    In or about February 2015, Purchaser-4 reached an agreement ("Contract-4") to purchase Property-4 for a total of $350,000.

      c.    In or about February 2015, Purchaser-4 sent the Purported Attorney a down payment in the form of a check for $10,000 payable to the Purported Attorney ("Down Payment-4").

      d.    The closing on Purchaser-4's intended purchase of Property-4 never occurred.

    15.    From my conversations with representatives of an entity (individually and collectively, "Purchaser-5") that intended to purchase a residential property in Queens, New York ("Property-5"), and from my review of documents, including email communications and bank records, I have learned, among other things, the following:

      a.    In or about March 2015, Purchaser-5 communicated with the Purported Attorney, who purported to work at the Purported Law Firm, about the potential purchase of Property-5. The Purported Attorney claimed to represent the owner of Property-5 ("Property Owner-5").

      b.    In or about March 2015, Purchaser-5 reached an agreement ("Contract-5") to purchase Property-5 for a total of $185,000, with $18,500 due as a down payment. Purchaser-5 signed Contract-5, which also appeared to have been signed by the Purported Attorney and Property Owner-5.

      c.    In or about March 2015, Purchaser-5 sent the Purported Attorney a down payment in the form of a check for $18,500 payable to the Purported Law Firm ("Down Payment-5").

      d.    The closing on Purchaser-5's intended purchase of Property-5 never occurred.

    16.    From my conversations with representatives of an

entity (individually and collectively, "Purchaser-6") that intended to purchase a residential property in Queens, New York ("Property-6"), and from my review of documents, including email communications and bank records, I have learned, among other things, the following:

        a.    In or about May 2015, Purchaser-6 communicated with the Purported Attorney, who purported to work at the Purported Law Firm, about the potential purchase of Property-6. The Purported Attorney claimed to represent a co-owner of Property-6 ("Property Owner-6").

        b.    In or about May 2015, Purchaser-6 reached an agreement ("Contract-6") to purchase Property-6 for a total of $600,000, with two payments of $30,000 each to be made as a down payment. Purchaser-6 signed Contract-6, which also appeared to have been signed by the Purported Attorney and Property Owner-6.

        c.    In or about May 2015, Purchaser-6 sent the Purported Attorney a partial down payment in the form of a check for $30,000 payable to the Purported Law Firm ("Down Payment-6").

        d.    The closing on Purchaser-6's intended purchase of Property-6 never occurred.

       17.    Based on my conversations with a relative of Property Owner-6, I have learned, among other things, the following:

        a.    Property Owner-6 died in or about May 2015.

        b.    In the months before Property Owner-6 died, Property Owner-6 neither signed Contract-6 nor was involved in any negotiations to sell Property-6.

### Financial Accounts and Transactions

       18.    From my review of bank records, including account statements, account-opening documents, and surveillance images, I have learned, among other things, the following:

        a.    On or about February 24, 2015, Purported Law Firm Account-1 and another account in the name of the Purported Law Firm ("Purported Law Firm Account-2") were opened at a Bank of America branch in New York, New York.

        b.    On or about March 14, 2015, an account in

the name of the Purported Law Firm ("Purported Law Firm Account-3") was opened at a TD Bank branch in New York, New York. Two individuals appeared together at the TD Bank branch to open the account. One of the two ("CC-1") identified herself in account-opening documents as the owner of the Purported Law Firm.

c.  On or about April 2, 2015, an account in the name of the Purported Law Firm ("Purported Law Firm Account-4") was opened at a Santander Bank branch in Garden City, New York.

19.  From my review of bank records, including account statements and surveillance images, I have learned, among other things, the following:

a.  Following the deposit of Down Payment-2 into Purported Law Firm Account-1 on or about March 12, 2015, Purported Law Firm Account-1 had a total balance of approximately $63,150.

b.  On or about March 16, 2015, $62,000 was transferred from Purported Law Firm Account-1 to Purported Law Firm Account-2.

c.  From on or about March 16, 2015 up to and including on or about March 19, 2015, approximately $61,882 was transferred out of Purported Law Firm Account-2 through multiple transactions, including a transfer of approximately $41,350 to Purported Law Firm Account-3. Following that transfer of approximately $41,350 from Purported Law Firm Account-2, Purported Law Firm Account-3 had a balance of approximately $41,360.

d.  On or about March 19, 2015, approximately $41,350 was withdrawn from Purported Law Firm Account-3 in two transactions: a withdrawal of approximately $36,000 followed by a withdrawal of approximately $5,350.

e.  On or about March 20, 2015, at a TD Bank branch in Queens, New York, an individual deposited Down Payment-1, Down Payment-3, Down Payment-4, and Down Payment-5 into Purported Law Firm Account-3.

f.  On or about May 4, 2015, at a Santander Bank branch in Queens, New York, an individual deposited Down Payment-6 into Purported Law Firm Account-4. From on or about May 5, 2015 up to and including on or about May 12, 2015, approximately $30,037.93 was transferred out of Purported Law Firm Account-4.

20. I have reviewed a photograph of CHANDRICA CLARKE, the defendant, obtained from law enforcement records. Based on my own review of that photograph and of surveillance images provided by banks, as well as on my conversations with other law enforcement officials who reviewed the surveillance images and have personally met CLARKE, I believe, among other things, the following:

   a. CLARKE is the individual seen in surveillance images with CC-1 when Purported Law Firm Account-3 was opened on or about March 14, 2015.

   b. CLARKE is the individual seen in surveillance images depositing Down Payment-1, Down Payment-3, Down Payment-4, and Down Payment-5 into Purported Law Firm Account-3 on or about March 20, 2015.

   c. CLARKE is the individual seen in surveillance images depositing Down Payment-6 into Purported Law Firm Account-4 on or about May 4, 2015.

21. I have spoken with a co-conspirator not named as a defendant herein ("CW-1").[1] From my conversations with CW-1, I have learned, among other things, the following:

   a. In or about March 2015, CW-1 conducted multiple financial transactions at the direction of another individual. In interviews with law enforcement, CW-1 identified that individual as the woman in a photograph from law enforcement records of CHANDRICA CLARKE, the defendant.

   b. On one occasion in or about March 2015, CLARKE gave CW-1 a check in the amount of $75,000 and directed CW-1 to attempt to cash it at a check-cashing business ("Check Casher-1"). CLARKE instructed CW-1 to lie to Check Casher-1, and say that the check represented proceeds from the sale of a home owned by a relative of CW-1. CW-1 attempted to cash the check as directed, but was unsuccessful. Subsequently, again at CLARKE's direction, CW-1 and another individual deposited the $75,000 check into an account at Citibank. CW-1 and the other individual made the deposit at a Citibank branch in New York, New York.

   c. On another occasion in or about March 2015,

---

[1] CW-1 has been providing information to law enforcement in the hopes of avoiding criminal charges. The information provided by CW-1 has proven to be reliable and has been corroborated by other evidence.

CLARKE gave CW-1 a check in the amount of $65,000 and directed CW-1 to attempt to deposit it at a check-cashing business ("Check Casher-2"). CW-1 cashed the check as directed, then delivered the cash CW-1 received from Check Casher-2 to CLARKE.

22. I have reviewed records, including account statements and surveillance images, from Citibank, and have learned, among other things, that on or about March 19, 2015, a check in the amount of $75,000 was deposited at Citibank by CW-1 and CC-1. The check was written from a bank account in the name of the Purported Law Firm and was payable to CW-1.

23. I have reviewed records, including account statements and surveillance images, from Check Casher-2, and have learned, among other things, that on or about March 16, 2015, a check in the amount of $65,000 was cashed at Check Casher-2 by CW-1. The check was written from a bank account in the name of the Purported Law Firm and was payable to CW-1.

24. I have spoken with another co-conspirator not named as a defendant herein ("CW-2").[2] From my conversations with CW-2, I have learned, among other things, the following:

    a. In or about April 2015, CW-2 opened or attempted to open bank accounts at the direction of another individual. In interviews with law enforcement, CW-2 identified that individual as the woman in a photograph from law enforcement records of CHANDRICA CLARKE, the defendant.

    b. On or about April 2, 2015, CLARKE directed CW-2 to open Purported Law Firm Account-4. CLARKE instructed CW-2 to give the bank certain documents, which CLARKE provided, pertaining to the Purported Law Firm. CLARKE further instructed CW-2 to lie to bank officials, and say that CW-2 was the President and Owner of the Purported Law Firm. CW-2 opened Purported Law Firm Account-4 as directed.

---

[2] CW-2 has been providing information to law enforcement in the hopes of avoiding criminal charges. The information provided by CW-2 has proven to be reliable and has been corroborated by other evidence.

25. Based on my training and experience, I know, among other things, that TD Bank, Bank of America, and Santander Bank, and all of their branches in the United States, were insured by the Federal Deposit Insurance Corporation from at least in or about January 2015 up to and including in or about September 2015.

WHEREFORE, deponent prays that a warrant be issued for the arrest of CHANDRICA CLARKE, the defendant, and that she be arrested and imprisoned, or bailed, as the case may be.

*Elizabeth Nygaard*
ELIZABETH NYGAARD
Special Agent
Federal Bureau of Investigation

Sworn to before me this
1st day of October, 2015

_____
THE HONORABLE MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK